IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 11, 2018 Session

FILED
01/18/2019
Clerk of the
Appellate Courts

## STATE OF TENNESSEE EX REL. HEAVENNEY GROESSE v. CHRISTOPHER LEE SUMNER

**Appeal from the Juvenile Court for Shelby County**
**No. Y0195     Harold W. Horne, Special Judge**

_____

**No. W2016-01953-COA-R3-JV**
_____

This appeal involves a petition for contempt of court for willful failure to pay child support related to one child. In June 2014, the mother filed a petition for contempt, alleging that the father had not paid his child support obligation as previously ordered by the trial court.[1] Following a hearing in July 2014, the trial court magistrate found the father to be in civil contempt of court for willful refusal to pay child support and ordered the father to make a $2,600.00 "purge" payment, which the father did. Upon the father's request, the trial court special judge conducted a rehearing in August 2016, again finding the father to be in civil contempt of court for willful refusal to pay child support. The trial court ordered a purge payment in the amount of $8,525.00, reflecting a child support arrearage that had accrued since the initial contempt hearing. Father has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Carol J. Chumney, Memphis, Tennessee, for the appellant, Christopher Lee Sumner.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, State of Tennessee *ex rel.* Heavenney Groesse.

Rachael E. Putnam and John D. Woods, III, Memphis, Tennessee, for the appellee, Heavenney Groesse.

_____

[1] On the same day that the 2014 petition was filed, the father filed a motion to modify his child support obligation, which was subsequently resolved in a separate proceeding.

# OPINION

## I. Factual and Procedural Background

The petitioner in this contempt action, Heavenney Groesse ("Mother"), and the respondent, Christopher Lee Sumner ("Father"), have one child together ("the Child"), who was born in September 2010. Upon Father's petition to establish parentage, the Shelby County Juvenile Court ("trial court") entered an order on May 30, 2012, confirming Father as a biological parent and approving an agreed schedule of temporary supervised visitation with the Child for Father.[2] The trial court subsequently entered an order on August 20, 2012, setting Father's initial monthly child support obligation at $1,156.00 and calculating an accrued arrearage in the amount of $26,144.00, to be paid by Father at a rate of $44.00 per month. The court also ordered, *inter alia*, that the parties were to equally divide medical expenses for the Child and that Father was to pay $750.00 related to Mother's attorney's fees.

According to the August 2012 order, which had been ratified by the trial court judge, the trial court magistrate had conducted a hearing in July 2012 concerning a petition for child support filed by Mother, who was represented by her retained counsel.[3] As the trial court also stated in its order, a "Title IV-D attorney" appeared during the July 2012 hearing. We note that the State of Tennessee ("the State") has provided child support enforcement services to Mother pursuant to Title IV-D of the Social Security Act, 42 U.S.C. § 651 *et seq.* Although Father was represented by attorney Darrell Blanton during the July 2012 hearing, Father did not personally appear.

On June 28, 2013, Father, proceeding *pro se*, filed a petition to modify child support, alleging that his income had been misrepresented in the prior order and requesting a reduction in his child support obligation. Mother filed a petition for contempt and for modification of the prior order on July 16, 2013, averring that Father

---

[2] On appeal, Father asserts that Mother "unpermissively brings up facts relative to the timing of the establishment of paternity and payment of child support prior to the December 2013 [agreed] Order . . . ." Having determined that the record documenting the factual and procedural history underlying the initial setting of Father's child support obligation was part of the record before the trial court, we include a background of events occurring prior to entry of the December 2013 agreed order insofar as we determine such events to be relevant to the original setting of Father's child support obligation and the subsequent modification of that obligation. *See, e.g.*, *McClain v. McClain*, 539 S.W.3d 170, 176 n.1 (Tenn. Ct. App. 2017).

[3] Although it is undisputed that Mother petitioned for child support to be set, her initial petition is not in the record on appeal. We note that in his petition to establish parentage, Father also requested, *inter alia*, that child support be set.

had not paid his child support as ordered and that he had violated certain provisions of the visitation order. Mother requested, *inter alia*, that Father be incarcerated until his child support obligation was paid and that his co-parenting time with the Child be reduced. On July 30, 2013, the State filed a petition for citation for contempt of court, also alleging that Father had not paid his child support obligation as ordered. In October 2013, the trial court entered an order dismissing the two petitions by agreement of the parties. The court noted that Father was at that time represented by attorney Milton E. Magee, Jr.

On December 27, 2013, the trial court entered an order approving an agreement announced by the parties. Within this agreed order and attached child support worksheet, the trial court: (1) found Father's stipulated gross income to be $4,850.00 per month; (2) found Mother's stipulated gross income to be $1,750.00 per month; (3) found that Mother would be exercising 227 days while Father would be exercising 138 days of co-parenting time yearly with the Child; (4) reduced Father's child support obligation to $800.00 per month beginning on October 1, 2013; (5) found that Father's child support arrearage had increased by $5,936.00 since the August 2012 order for a total arrearage of $32,080.00; (6) increased Father's arrearage payments to $50.00 per month; (7) ordered Father and Mother to divide the Child's existing medical bills equally; and (8) ordered Father to maintain health and dental insurance coverage on the Child.

On June 18, 2014, Mother initiated the action leading to this appeal by filing a "Petition for Citation for Contempt of Court," alleging that Father had willfully failed to pay child support as previously ordered despite being able to do so. Mother concomitantly filed a petition to modify the December 2013 agreed order, averring that Father's child support obligation should be increased because a "significant variance" existed between the amount of the previously ordered support and what it should be under the Child Support Guidelines. On the same day, Father filed a "Motion to Modify Child Support Order," also averring that a significant variance existed but asserting that the variance warranted a reduction in his child support obligation. On June 27, 2014, Father filed an answer to Mother's petition, claiming his inability to pay child support as ordered. On July 18, 2014, Father filed an amendment to the answer, again proffering his inability to pay child support and attaching several exhibits, including copies of personal and business tax returns, bank statements, checks, and spreadsheets reflecting business expenses.

Following a hearing on the contempt petition conducted by Magistrate Joseph G. Little on July 22, 2014, the magistrate entered findings and recommendations, which were ratified by the trial court judge later on the same day. In its order, the trial court found that Father "was and is able to comply with the Court's order of support and willfully refused to pay," holding Father in civil contempt of court. The trial court ordered that Father would "be confined to the Shelby County Jail for 30 days or until he

3

purge[d] himself of contempt by paying to the Clerk of Court the sum of $2,600.00, a part of the amount he [was] in arrears." The trial court also awarded $3,323.70 in attorney's fees to Mother's counsel. Father tendered the $2,600.00 purge payment to the trial court clerk on the day of the hearing. On July 29, 2014, Father filed a request for rehearing before the trial court judge. The order from the July 22, 2014 hearing was entered on July 30, 2014.

The rehearing did not take place until August 2, 2016, with Special Judge Harold W. Horne presiding.[4] In the meantime, asserting that a material change in circumstance had occurred, Father filed a "Petition to Modify, Petition for Contempt, and Petition to Modify Child Support" on January 9, 2015. As to his contempt allegation, Father averred that Mother had not paid half of the Child's outstanding medical bills as required by the December 2013 order. In response, Mother filed an answer, denying all substantive allegations and requesting attorney's fees incurred in defending against the contempt allegation. On January 12, 2015, Mother filed another petition for citation of contempt against Father, again alleging that he had willfully failed to pay child support and asserting that he had failed to pay $3,323.70 in attorney's fees previously awarded to Mother. Following several continuances and the parties' unsuccessful attempt at mediation, the trial court entered an "Order Granting Discovery" upon the parties' joint motion on October 15, 2015.

During the rehearing, the trial court heard testimony from the parties; Father's wife and business partner, M.S.; Father's mother, D.S.; Father's business colleague, W.R.; and a certified public accountant retained by Father as an expert witness, William Robert Vance, Jr. Undisputed testimony demonstrated that Father and M.S. had been married in November 2013 and had a daughter together, who was born in August 2015. Father testified that he was self-employed as a 51% owner of his own insurance business, RS Financial, LLC ("RS Financial"). In 2014, M.S. became a partner in RS Financial with a 49% ownership interest. Father testified that he worked as a financial planner for RS Financial while M.S. was the president of the company, handling marketing and "compliance." M.S. corroborated this testimony. Father testified that he originally shared 50-50 ownership interest in RS Financial with his colleague, W.R. Father acknowledged that W.R. had been removed from the membership list of the company in

---

[4] The September 1, 2016 order related to this hearing includes language stating that Special Judge Horne had been appointed by the trial court judge. However, the order was signed by Special Judge Horne and not by the trial court judge. *See, e.g.*, *State ex rel. Williams v. Woods*, 530 S.W.3d 129, 137-39 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. Aug. 21, 2017) (determining in a situation involving a similarly executed order that included appointment of a special judge: "Inasmuch as there has been no objection by any party to [the special judge's] authority to preside over this matter in the absence of a valid appointment order, we determine that the special judge was acting as a *de facto* judge."). Neither party has raised an issue concerning the validity of the order appointing Special Judge Horne.

the 2012 annual report. For his part, W.R. testified that as an independent contractor, he maintained a good working relationship with Father and that they had discussed his becoming a partner in RS Financial. However, W.R. stated that to his knowledge, "the paperwork never got filed" to make him a partner.

Father testified that at the time of trial, all of his income flowed through RS Financial and that he was required to pay other brokers' "1099" commissions as independent contractors before paying himself. Father and M.S. further testified to multiple outstanding debts that they collectively owed, including past-due mortgage payments; $800.00 monthly payments on a loan for a Chevrolet Tahoe purchased in December 2015 for $46,000.00; $16,000.00 in taxes and penalties owed to the Internal Revenue Service; and $25,000.00 in funds that Father had borrowed from his mother and intended to repay. Father also indicated that he had spent a substantial amount of money in attorney's fees related to this action. M.S. testified that she and Father had paid $3,800.00 to Mr. Vance as an expert witness fee.

During the rehearing, Mother presented evidence of the December 27, 2013 agreed order listing Father's stipulated income as $4,850.00 per month; a record of Father's child support payment history from September 2012 through June 2016; and a summary of Father's personal and business bank statements for 2013 and 2014 in support of her allegation that Father had willfully refused to pay child support as ordered. Father did not challenge the child support payment history but did dispute that he had the ability to pay the support ordered during the relevant time periods.

At the conclusion of the rehearing, the trial court found that Father had the ability to meet his child support obligation and that "the decision to fail to make those payments [was] willful and intentional." The trial court ordered Father to be held in confinement until he made a purge payment of $8,525.00, noting that this was the "portion of the support that [had not] been paid plus the $50.00 a month on arrearages that [had] been due since the last purge payment," minus a $1,000.00 payment made by Father the day before the rehearing. The trial court awarded attorney's fees to Mother but reserved the exact amount for determination at a subsequent hearing. On September 1, 2016, the trial court entered a written order confirming its oral ruling. Father filed a notice of appeal to this Court on the same day.

Determining that this Court lacked subject matter jurisdiction because the order appealed from was not final, this Court entered an order on December 15, 2016, directing Father to obtain entry of a final judgment or show cause why the appeal should not be dismissed. This Court stated specifically that "we can find nothing in the record reflecting that the trial court fully adjudicated the award of attorney fees to [Mother]" contained within the trial court's September 1, 2016 order. Upon Father's subsequent

5

motions, this Court entered two orders extending the time for Father to procure a final judgment to facilitate a hearing in the trial court.

Following a hearing conducted on May 2, 2017, the trial court entered an order on July 12, 2017, awarding reasonable attorney's fees and expenses to Mother's counsel in the total amount of $29,648.80.[5] The trial court stated in the order: "This is intended to be a final Order and all other matters not expressly ruled upon herein are hereby denied." This appeal on the contempt action then proceeded. *See* Tenn. R. App. P. 4(d) ("A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof.").

During the pendency of this appeal, the trial court, with Magistrate Sheldon Y. McCall presiding, conducted a hearing regarding Father's petitions to modify child support over the course of two non-consecutive days on January 25, 2017, and May 10, 2017. The trial court entered an order on November 20, 2017, and upon Father's motion, this Court granted permission for the appellate record to be supplemented with the November 20, 2017 order and a subsequent order concerning attorney's fees for the modification action.

In the November 20, 2017 order, the trial court proceeded to retroactively modify Father's child support obligation due to, *inter alia*, a recalculation of Mother's income, changing health insurance plans for the Child, and credits for Father and Mother that had not been previously factored into the child support calculations. The order attached six different child support worksheets, setting retroactive monthly child support obligations for different periods of time. Following a hearing, the trial court entered an order on November 27, 2017, awarding to Mother a judgment for attorney's fees and expenses related to the petitions to modify child support. Although Father initially filed a petition for rehearing on this attorney's fee order, he subsequently nonsuited his petition on March 21, 2018. We emphasize that the instant appeal concerns the contempt action.

## II. Issues Presented

Father presents five issues on appeal, which we have reordered slightly and restated as follows:

1.      Whether the trial court erred by applying a preponderance-of-the-evidence standard in finding Father in contempt of court.

---

[5] As with the earlier order entered by Special Judge Horne, the order contained language stating that the special judge was appointed by the trial court judge to hear the matter, but the order was signed by Special Judge Horne and not by the trial court judge.

2.      Whether the trial court erred by considering the intervening time period between the initial July 22, 2014 contempt hearing before the magistrate and the rehearing before the special judge.

3.      Whether the trial court violated Father's due process rights under the United States and Tennessee Constitutions.

4.      Whether the trial court erred by finding that Father had the ability to pay his child support obligation and was in willful contempt of the December 2013 child support order.

5.      Whether the trial court erred by awarding to Mother a judgment for attorney's fees in the amount of $29,648.80.[6]

The State has raised the following additional issue in response to Father's argument on appeal:

6.      Whether Father is entitled to an award of attorney's fees related to this appeal.[7]

## III. Standard of Review

We review a non-jury case *de novo* upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). We review questions of law *de novo* with no presumption of correctness. *Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)); *see also In re Estate of Haskins*, 224 S.W.3d 675, 678 (Tenn. Ct. App. 2006). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent

---

[6] In an apparent typographical error, Father states the amount of the relevant attorney's fee award as $29,680.80 in his statement of the issues. However, in the argument sections of his principal and reply briefs, Father correctly lists the amount of the award as $29,648.80.

[7] In the argument section in Father's amended principal brief concerning attorney's fees awarded at trial, Father requests that this Court award him attorney's fees on appeal. Although Father did not include this request in his statement of the issues, *see* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review."), the State added Father's request for attorney's fees on appeal as an additional issue.

clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"A trial court's use of its contempt power is within its sound discretion and will be reviewed by an appellate court under an abuse of discretion standard." *McLean v. McLean*, No. E2008-02796-COA-R3-CV, 2010 WL 2160752, at *3 (Tenn. Ct. App. May 28, 2010) (citing *Outdoor Mgmt., LLC v. Thomas,* 249 S.W.3d 368, 377 (Tenn. Ct. App. 2007)); *see In re Estate of Greenamyre*, 219 S.W.3d 877, 886 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Mar. 12, 2007) ("[A] trial court will be found to have 'abused its discretion' only when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party.") (internal citations omitted). Likewise, this Court reviews a trial court's award of attorney's fees according to an abuse of discretion standard. *See Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011).

Although this appeal primarily concerns a contempt action, to the extent that we must review the trial court's determinations regarding child support, we note that these are also reviewed under an abuse of discretion standard. *See Mayfield v. Mayfield*, 395 S.W.3d 108, 114-15 (Tenn. 2012); *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Mar. 20, 2006). As this Court has explained:

> Prior to the adoption of the Child Support Guidelines, trial courts had wide discretion in matters relating to child custody and support. *Hopkins v. Hopkins*, 152 S.W.3d 447, 452 (Tenn. 2004) (Barker, J., dissenting). Their discretion was guided only by broad equitable principles and rules which took into consideration the condition and means of each parent. *Brooks v. Brooks*, 166 Tenn. 255, 257, 61 S.W.2d 654, 654 (1933). However, the adoption of the Child Support Guidelines has limited the courts' discretion substantially, and decisions regarding child support must be made within the strictures of the Child Support Guidelines. *Berryhill v. Rhodes*, 21 S.W.3d 188, 193 (Tenn. 2000); *Jones v. Jones*, 930 S.W.2d 541, 545 (Tenn. 1996); *Smith v. Smith*, 165 S.W.3d 279, 282 (Tenn. Ct. App. 2004).

*Richardson*, 189 S.W.3d at 725.

IV. Contempt of Court

Overall, Father contends that the trial court erred by finding that his failure to pay his child support obligation as required by the December 2013 agreed order was willful

and that the trial court thereby erred by finding him in contempt of court. Father specifically argues that the evidence demonstrated that he did not have the ability to pay the full amount of his child support obligation during the relevant time periods. Within this overarching contention, Father also raises three related issues concerning the contempt finding in the *de novo* rehearing, arguing that the trial court erred by (1) applying a preponderance-of-the-evidence standard, (2) considering the intervening time period between the initial contempt decision rendered by the magistrate and the rehearing, and (3) violating Father's due process rights. We will address each of these related issues in turn before addressing the overarching issue of whether the trial court erred in finding that Father willfully violated the December 2013 order such that he was in contempt of the order.

Tennessee Code Annotated § 29-9-102(3) (2012) authorizes courts to find a person who willfully disobeys "any lawful writ, process, order, rule, decree, or command" of a court to be in contempt of court. As to punishment for contempt, Tennessee Code Annotated § 29-9-103 (2012) provides in relevant part:

(a)     The punishment for contempt may be by fine or by imprisonment, or both.

(b)     Where not otherwise specially provided, the circuit, chancery, and appellate courts are limited to a fine of fifty dollars ($50.00), and imprisonment not exceeding ten (10) days . . . .

"Under this statutory scheme, a court may utilize the remedy of incarceration for either civil or criminal contempt." *McClain v. McClain*, 539 S.W.3d 170, 218 (Tenn. Ct. App. 2017) (citing *Ahern v. Ahern*, 15 S.W.3d 73, 79 (Tenn. 2000)).

As a threshold matter, Father argues that the trial court's contempt judgment against him should be vacated because the court failed to specify whether the contempt finding was civil or criminal. However, Father acknowledges that because the trial court afforded Father the opportunity to make a "purge" payment and thereby avoid incarceration, the contempt finding "appears to be in the nature of civil contempt . . . ." Mother and the State argue that the trial court clearly found Father to be in civil contempt of court. We agree with Mother and the State on this point.

As this Court has recently stated:

In a case such as the one at bar when the trial court has punished contempt with incarceration but not specified the type of contempt, we look to "[h]ow the trial court utilizes the remedy of incarceration" to determine

9

whether the contempt is civil or criminal. *See State ex rel. Farris v. Bryant*, No. E2008-02597-COA-R3-CV, 2011 WL 676162, at *5 (Tenn. Ct. App. Feb. 24, 2011). As this Court has explained:

> With civil contempt, the court can incarcerate the individual in order to compel performance of the court's order. *Ahern*, [*v. Ahern*], 15 S.W.3d [73,] 79 [(Tenn. 2000)]. In effect, the contemnor "has the 'keys to the jail' and can purge the contempt by complying with the court's order." *Id.* (citations omitted). In contrast, "[p]unishment for criminal contempt is punitive in character; it is imposed to vindicate the authority of the law." *State ex rel. Everson v. [Gooch]*, 1990 WL 3976, at *1 (Tenn. Ct. App. Jan. 24, 1990). "It is a punitive proceeding intended to impose a fixed punishment for past actions. Punishment for criminal contempt is not conditional and must be served, even if the contemnor later complies with the court's order." *McLean v. McLean*, No. E2008-02796-COA-R3-CV, 2010 WL 21[6]0752, at *3 (Tenn. Ct. App. May 28, 2010) (quoting *Jones v. Jones*, 1997 WL 80029, at *2 (Tenn. Ct. App. Feb. 26, 1997)); see also *Black [v. Blount]*, 938 S.W.2d [394,] 398 [(Tenn. 1996)].

> *Id.*

*McClain*, 539 S.W.3d at 218-19 (determining that an eight-day "suspended sentence" imposed for past acts of contempt with no opportunity to purge the contempt constituted punishment for criminal contempt).

In this case, the trial court found in its September 2016 order that Father at the time of trial had "the present ability to purge himself of contempt by making a payment of his arrearage in the amount of $8,525.00, a part of the amount he is in arrears." The trial court directed Father to "be confined in the Shelby County Jail until he purge[d] himself of contempt by paying to the Clerk of the Court the sum of $8,525.00, a part of the amount he [was] in arrears." Because the trial court directed that Father could purge himself of contempt by making the $8,525.00 arrearage payment, we determine that the trial court found Father to be in civil contempt of court, not criminal contempt. *See id.* Contrary to Father's argument, we discern no reversible error in the trial court's failure to specify in the order whether the contempt found was civil or criminal because we are able to determine readily from the trial court's utilization of the remedy of incarceration in order to compel performance that this was civil contempt. *See McClain*, 539 S.W.3d at 218 (citing *State ex rel. Farris*, 2011 WL 676162, at *5).

10

Regarding civil contempt proceedings, our Supreme Court has elucidated in pertinent part:

Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

The threshold issue in any contempt proceeding is whether the order alleged to have been violated is "lawful." A lawful order is one issued by a court with jurisdiction over both the subject matter of the case and the parties. *Vanvabry v. Staton*, 88 Tenn. 334, 351-52, 12 S.W. 786, 791 (1890); *Churchwell v. Callens*, 36 Tenn. App. 119, 131, 252 S.W.2d 131, 136-37 (1952). An order is not rendered void or unlawful simply because it is erroneous or subject to reversal on appeal. *Vanvabry v. Staton*, 88 Tenn. at 351, 12 S.W. at 791; *Churchwell v. Callens*, 36 Tenn. App. at 131, 252 S.W.2d at 137. Erroneous orders must be followed until they are reversed. *Blair v. Nelson*, 67 Tenn. (8 Baxt.) 1, 5 (1874). However, an order entered without either subject matter jurisdiction or jurisdiction over the parties is void and cannot provide the basis for a finding of contempt. *Brown v. Brown*, 198 Tenn. 600, 610, 281 S.W.2d 492, 497 (1955); *Howell v. Thompson*, 130 Tenn. 311, 323-24, 170 S.W. 253, 256 (1914). Naturally, the determination of whether a particular order is lawful is a question of law.

The second issue involves the clarity of the order alleged to have been violated. A person may not be held in civil contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. *Sanders v. Air Line Pilots Ass'n Int'l*, 473 F.2d 244, 247 (2d Cir. 1972); *Hall v. Nelson*, 282 Ga. 441, 651 S.E.2d 72, 75 (2007); *Marquis v. Marquis*, 175 Md. App. 734, 931 A.2d 1164, 1171 (2007); *Cunningham v. Eighth Judicial Dist. Ct. of Nev.*, 102 Nev. 551, 729 P.2d 1328, 1333-34 (1986); *Petrosinelli v. People for the Ethical Treatment of Animals, Inc.*, 273 Va. 700, 643 S.E.2d 151, 154-55 (2007). The order must, therefore, be clear, specific, and unambiguous. *See Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d [465,] 471 [(Tenn.

11

2003)]; *Long v. McAllister-Long*, 221 S.W.3d [1,] 14 [(Tenn. Ct. App. 2006)].

* * *

The third issue focuses on whether the party facing the civil contempt charge actually violated the order. This issue is a factual one to be decided by the court without a jury. *See Pass v. State*, 181 Tenn. 613, 620, 184 S.W.2d 1, 4 (1944); *Sherrod v. Wix*, 849 S.W.2d 780, 786 (Tenn. Ct. App. 1992). The quantum of proof needed to find that a person has actually violated a court order is a preponderance of the evidence. *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d at 474. Thus, decisions regarding whether a person actually violated a court order should be reviewed in accordance with the standards in Tenn. R. App. P. 13(d).

The fourth issue focuses on the willfulness of the person alleged to have violated the order. The word "willfully" has been characterized as a word of many meanings whose construction depends on the context in which it appears. *Spies v. United States*, 317 U.S. 492, 497, 63 S. Ct. 364, 87 L. Ed. 418 (1943); *United States v. Phillips*, 19 F.3d 1565, 1576-77 (11th Cir. 1994). Most obviously, it differentiates between deliberate and unintended conduct. *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d [602,] 612 [(Tenn. Ct. App. 2006)]. However, in criminal law, "willfully" connotes a culpable state of mind. In the criminal context, a willful act is one undertaken for a bad purpose. *Bryan v. United States*, 524 U.S. 184, 191, 118 S. Ct. 1939, 141 L. Ed. 2d 197 (1998); *State v. Braden*, 867 S.W.2d 750, 761 (Tenn. Crim. App. 1993) (upholding an instruction stating that "[a]n act is done willfully if done voluntarily and intentionally and with the specific intent to do something the law forbids").

In the context of a civil contempt proceeding under Tenn. Code Ann. § 29-2-102(3), acting willfully does not require the same standard of culpability that is required in the criminal context. *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d at 612. Rather, willful conduct

> consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is 'willful' if it is the product of free will rather than coercion. Thus, a person acts 'willfully' if he or she is a free agent,

12

> knows what he or she is doing, and intends to do what he or she is doing.
>
> *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d at 612 (citations omitted). Thus, acting contrary to a known duty may constitute willfulness for the purpose of a civil contempt proceeding. *United States v. Ray*, 683 F.2d 1116, 1127 (7th Cir. 1982); *City of Dubuque v. Iowa Dist. Ct. for Dubuque County*, 725 N.W.2d 449, 452 (Iowa 2006); *Utah Farm Prod. Credit Ass'n v. Labrum*, 762 P.2d 1070, 1074 (Utah 1988). Determining whether the violation of a court order was willful is a factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and assess their credibility. Thus, findings regarding "willfulness" should be reviewed in accordance with the Tenn. R. App. P. 13(d) standards.[8]
>
> After determining that a person has willfully violated a lawful and sufficiently clear and precise order, the court may, in its discretion, decide to hold the person in civil contempt. *See Robinson v. Air Draulics Eng'g Co.*, 214 Tenn. 30, 37, 377 S.W.2d 908, 912 (1964). The court's decision is entitled to great weight. *Hooks v. Hooks*, 8 Tenn. Civ. App. (Higgins) 507, 508 (1918). Accordingly, decisions to hold a person in civil contempt are reviewed using the abuse of discretion standard of review. *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993); *Moody v. Hutchison*, 159 S.W.3d 15, 25-26 (Tenn. Ct. App. 2004).

*Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 354-58 (Tenn. 2008) (footnotes omitted).

Father does not dispute the first two required elements for a finding of civil contempt: that the December 2013 order was lawful and that the directive in the order for Father to pay his child support obligation at a rate of $800.00 monthly and his arrearage obligation at a rate of $50.00 monthly was clear, specific and unambiguous. Father's overarching argument involves the third and fourth elements inasmuch as he asserts that he paid as much of his child support obligation as he had the ability to pay and therefore his failure to pay the full amount purportedly was not willful.

---

[8] Pursuant to Tennessee Rule of Appellate Procedure 13(d), this Court reviews factual findings, such as the element of willfulness in civil contempt, *de novo* upon the record unless the evidence preponderates against those findings, in other words, according to a preponderance-of-the-evidence standard.

A. Civil Contempt Evidentiary Standard

Father asserts that even interpreting the contempt judgment at issue as one for civil contempt, the trial court erred by applying a preponderance-of-the-evidence standard and declining to apply a clear-and-convincing evidentiary standard. Father acknowledges that the established evidentiary standard in Tennessee for a finding of civil contempt is by a preponderance of the evidence. *See Konvalinka*, 249 S.W.3d at 356 ("The quantum of proof needed to find that a person has actually violated a court order is a preponderance of the evidence."). Nevertheless, Father asks this Court to decide that the evidentiary standard should be changed. We conclude that the trial court correctly applied the proper evidentiary standard.

Mother posits as a threshold matter that Father waived his argument concerning the evidentiary standard because he did not raise it until his closing argument before the trial court. *See In re Adoption of E.N.R.*, 42 S.W.3d 26, 32 (Tenn. 2001) ("We are of the opinion that there is little difference between an issue improperly raised before the trial court at the last minute and one that was not raised at all."). During closing argument in the August 2016 rehearing, Father's counsel stated, "I believe the burden would be clear and convincing evidence that would apply here . . . ." Neither Mother nor the State raised an objection at that time. When the trial court then ruled from the bench, the court began by stating, "Well, the burden of proof in this case is a preponderance of evidence."

Although Father did essentially raise this issue before the trial court at the last minute, the trial court ruled on the issue over no objection from the opposing side to the late-raising of the issue. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). We will therefore address Father's argument, noting that it concerns a matter of Tennessee law, which we review *de novo* with no presumption of correctness. *See In re Zamorah B.*, No. M2011-00864-COA-R3-JV, 2013 WL 614449, at *3 (Tenn. Ct. App. Feb. 15, 2013) ("The proper standard to be used by a trial court is a question of law, which we must review without according any presumption of correctness to the trial court's determination of that question." (citing *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2000); *Placencia v. Placencia*, 48 S.W.3d 732, 734 (Tenn. Ct. App. 2000)).

Father requests that this Court follow precedent regarding the evidentiary standard related to civil contempt proceedings in federal courts and other select states rather than precedent established in Tennessee courts under the state statutory scheme. *See, e.g., S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 145 (2d Cir. 2010) (explaining that in a case involving violation of an order to provide or permit discovery, under Federal Rule of Civil Procedure 37(b)(2)(A), the "proof of non-compliance" must be

"clear and convincing" (quoting *EEOC v. Local 638*, 81 F.3d 1162, 1171 (2d Cir. 1996))); *In re Birchall*, 913 N.E.2d 799, 803-04 (Mass. 2009) (revising prior state precedent to hold that in Massachusetts, the evidentiary standard for civil contempt would henceforth require that a "finding be supported by clear and convincing evidence of disobedience of a clear and unequivocal command").  Father essentially asks this Court to change our Supreme Court's longstanding interpretation of Tennessee law.  This we will not and cannot do.  *See Bloodworth v. Stuart*, 428 S.W.2d 786, 789 (Tenn. 1968) ("The Court of Appeals has no authority to overrule or modify [the] Supreme Court's opinions."); *Shepherd Fleets, Inc. v. Opryland USA, Inc*., 759 S.W.2d 914, 924 (Tenn. Ct. App. 1988), *perm. app. denied* (Tenn. Oct. 24, 1988) ("[T]his Court should not presume to modernize or modify the decisions of the Tennessee Supreme Court.").  Father is not entitled to relief on this issue.

## B. *De Novo* Rehearing

Father contends that the trial court erred during the August 2, 2016 rehearing by considering evidence presented regarding the intervening two years between the initial contempt hearing before the magistrate on July 22, 2014, and the rehearing before the special judge.  While acknowledging that "[s]ome Tennessee courts have held that rehearings in the juvenile court are *de novo* with a full evidentiary hearing," Father argues that his request for a hearing before the judge should be construed more in keeping with a Tennessee Rule of Civil Procedure 59.04 motion to alter or amend the magistrate's judgment.  The State argues that the trial court judge properly considered the evidence of Father's payment of the child support obligation as it existed at the time of the August 2016 hearing.  Upon careful review of the record and applicable authorities, we conclude that the trial court properly conducted a *de novo* hearing.

Tennessee Code Annotated § 37-1-107 sets forth the procedures for, *inter alia*, the utilization of magistrates in juvenile court and requests for rehearing before the juvenile court judge.  In interpreting this statute, we apply the following longstanding principles of statutory construction:

> When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.,* 90 S.W.3d 676, 678 (Tenn. 2002).  In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.,* 173 S.W.3d 714, 722 (Tenn. 2005).  When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem.*

*Co. v. Johnson,* 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.,* 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool,* 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson,* 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga,* 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed. *Owens v. State,* 908 S.W.2d 923, 926 (Tenn. 1995).

*In re Estate of Tanner*, 295 S.W.3d 610, 613-14 (Tenn. 2009).

The version of Tennessee Code Annotated § 37-1-107 (2014) in effect at the time that Father filed his request for a hearing before the juvenile court judge provided in relevant part:

(b)     The judge may direct that any case or class of cases shall be heard in the first instance by the magistrate in all cases wherein the juvenile court has jurisdiction in the manner provided for the hearing of cases by the court.

(c)     A magistrate has the same authority as the judge to issue any and all process. The magistrate in the conduct of the proceedings has the powers of a trial judge.

(d)     Upon the conclusion of the hearing in each case, the magistrate shall transmit to the judge all papers relating to the case, together with the magistrate's findings and recommendations in writing. Any hearing by a magistrate on any preliminary matter is final and not reviewable by the judge of the juvenile court, except on the court's own motion. . . .

(e)     Any party may, within five (5) days thereafter, excluding nonjudicial days, file a request with the court for a hearing by the judge of the juvenile court. The judge may, on the judge's own motion, order a

16

rehearing of any matter heard before a magistrate, and shall allow a hearing if a request for such hearing is filed as herein prescribed. Unless the judge orders otherwise, the recommendation of the magistrate shall be the decree of the court pending a rehearing.

(f)     In case no hearing before the judge is requested, or when the right to a hearing is waived, the findings and recommendations of the magistrate become the decree of the court when confirmed by an order of the judge. The final order of the court is, in any event, proof of such confirmation, and also of the fact that the matter was duly referred to the magistrate. A party may appeal such order pursuant to the provisions of § 37-1-159.

Father relies in part on the absence of the term, "*de novo*," in the version of Tennessee Code Annotated § 37-1-107 applicable to this case. However, this Court has held under the applicable version of the statute, as well as prior versions, that the rehearing of a magistrate's decision before a juvenile court judge "contemplates a traditional *de novo* hearing." *See Kelly v. Evans*, 43 S.W.3d 514, 515 (Tenn. Ct. App. 2000), *perm. app. denied* (Tenn. Mar. 30, 2001); *see also In re Zamorah B.*, 2013 WL 614449, at *4 ("The *de novo* hearing is not a review of the record presented to the magistrate, but is a full evidentiary hearing akin to a new trial, as in an appeal from a general sessions court to a circuit court." (citing *Kelly*, 43 S.W.3d at 515)).

Additionally, this statutory section has since been amended by the General Assembly, effective July 1, 2016, in part to expressly state, in a subsection now codified at -107(d), that a request for a rehearing of a magistrate's decision is a request for "a de novo hearing by the judge of the juvenile court." Tenn. Code Ann. § 37-1-107(d) (Supp. 2018) (emphasis added); 2016 Tenn. Pub. Acts, Ch. 716 § 1 (S.B. 2572) (substituting revised subsections (b)-(g) in their entirety). Although the General Assembly did not provide for retroactive application of the 2016 amendment, *see* 2016 Tenn. Pub. Acts, Ch. 716 § 1 (S.B. 2572), we note that when analyzing legislative intent, we may view a subsequent, non-retroactive amendment as "declaratory of the original legislative intent." *See Sneed v. City of Red Bank*, 459 S.W.3d 17, 32 (Tenn. 2014) (quoting *Fretwell v. Chaffin*, 652 S.W.2d 755, 757 (Tenn. 1983)). In this case, the addition of the term, *de novo*, to the statute serves as clarification that the intent of the legislature concerning the nature of a rehearing of a magistrate's decision before a juvenile court judge was in alignment with this Court's previous interpretation of the prior versions of the statute.

This Court recently explained in a case requiring application of the version of Tennessee Code Annotated § 37-1-107 also applicable here:

17

Although, at the time [the respondent] requested a rehearing, the statute merely provided for "a hearing" before the juvenile court, our courts interpreted the statutory language as requiring a de novo hearing. *See* Tenn. Code Ann. § 37-1-107(e) (2014); *Kelly v. Evans*, 43 S.W. 3d 514, 515-16 (Tenn. Ct. App. 2000). After recent amendments, the statute now expressly provides for a de novo hearing. *See* Tenn. Code Ann. § 37-1-107(d) (Supp. 2017) ("Any party may, within ten (10) days after entry of the magistrate's order, file a request with the court for a de novo hearing by the judge of the juvenile court.").

*In re Michael J.*, No. M2016-01985-COA-R3-JV, 2018 WL 638250, at *3 n.2 (Tenn. Ct. App. Jan. 31, 2018), *perm. app. denied* (Tenn. May 16, 2018) (determining that the juvenile court had properly conducted a *de novo* review of the magistrate's decision despite an evidentiary error that proved harmless).

In describing a *de novo* hearing before the juvenile court judge of an action previously heard by a magistrate, this Court has stated:

The *de novo* hearing is not a review of the record presented to the magistrate, but is a full evidentiary hearing akin to a new trial, as in an appeal from a general sessions court to a circuit court. *Kelly*, 43 S.W.3d at 515; *see also Kissick v. Kallaher*, No. W2004-02983-COA-R3-CV, 2006 WL 1350999, at *3 (Tenn. Ct. App. May 18, 2006) (no Tenn. R. App. P. 11 application filed) (judgment of the juvenile court vacated and remanded for a *de novo* trial because the juvenile court judge reviewed the referee's decision without a hearing or the presentation of any evidence). Accordingly, in a *de novo* hearing, the juvenile court judge must decide the issues without regard to the actions of the Referee.

*In re Zamorah B.*, 2013 WL 614449, at *4. Continuing the analogy to a *de novo* proceeding in an appeal from a general sessions court to a circuit court, this Court has summarized that "the cases analyzing general sessions appeals have consistently found that the matter is tried in circuit court as if no other trial had occurred." *Green v. Green*, No. M2007-01263-COA-R3-CV, 2009 WL 348289, at *8 (Tenn. Ct. App. Feb. 11, 2009) (citing *Ware v. Meharry Med. Coll.*, 898 S.W.2d 181, 184 (Tenn. 1995)).

Inasmuch as a hearing conducted before the juvenile court judge of a matter previously decided by a magistrate is a *de novo* hearing, *see Kelly*, 43 S.W.3d at 515, the trial court in this case did not err by considering whether Father had violated the December 2013 order from the time of the order's entry to the time of the August 2016 *de novo* hearing. Father is not entitled to relief on this issue.

C. Due Process

Father argues that the trial court violated his procedural due process rights during the rehearing by considering the financial evidence presented for the time period subsequent to the July 2014 hearing purportedly without giving notice to Father that such would be considered, allegedly depriving Father of the opportunity to defend himself fully. Father also argues that the trial court's procedure in conducting the contempt rehearing was "fundamentally unfair and violated his due process" rights because Father's previously filed petition for modification of his child support obligation had not yet been resolved. Additionally, Father argues that the trial court erred by violating his substantive due process rights because the court made him subject to double jeopardy, punishing him twice on findings stemming from the same contempt petition and requiring two purge payments. The State and Mother argue that Father's due process claims must fail because (1) he waived the issues by failing to raise them before the trial court, (2) he was on notice of the possibility of an additional purge payment and had the opportunity to defend himself during the rehearing, (3) the December 2013 order was the prevailing and valid order concerning child support at the time of the contempt rehearing, and (4) double jeopardy is not applicable to a civil proceeding. Upon a thorough review of the record and applicable authorities, we conclude that Father waived any argument concerning the timing of the contempt rehearing. We further conclude that Father has not established any violation of his due process rights.

Regarding due process, our Supreme Court has explained:

Both the United States and Tennessee Constitutions protect the right to due process of law. Section 1 of the Fourteenth Amendment to the United States Constitution provides, "No State shall make or enforce any law which . . . deprive[s] any person of life, liberty, or property, without due process of law . . . ." Article I, section 8 of the Tennessee Constitution states, "[N]o man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land." We have determined that this provision of the Tennessee Constitution is "synonymous" with the Due Process Clause of the Fourteenth Amendment. *Gallaher* [*v. Elam* ], 104 S.W.3d [455,] 463 [(Tenn. 2003)] (citing *Riggs* [*v. Burson* ], 941 S.W.2d [44,] 51 [(Tenn. 1997)]).

*Hughes v. Tenn. Bd. of Prob. & Parole*, 514 S.W.3d 707, 715 (Tenn. 2017).

19

As to the distinction between procedural and substantive due process, our Supreme Court has elucidated:

> Due process under the state and federal constitutions encompasses both procedural and substantive protections. The most basic principle underpinning procedural due process is that individuals be given an opportunity to have their legal claims heard at a meaningful time and in a meaningful manner. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429-30, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982); *Manning v. City of Lebanon*, 124 S.W.3d 562, 566 (Tenn. Ct. App. 2003). In contrast, substantive due process limits oppressive government action, such as deprivations of fundamental rights like the right to marry, have children, make child rearing decisions, determine child custody, and maintain bodily integrity. *See Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997); *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn. 1993). Substantive due process claims may be divided into two categories: (1) deprivations of a particular constitutional guarantee and (2) actions by the government which are "arbitrary, or conscience shocking in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992); *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997). In short, substantive due process bars certain government action regardless of the fairness of the procedures used to implement them. *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998).

*Lynch v. City of Jellico*, 205 S.W.3d 384, 391-92 (Tenn. 2006).

## 1. Waiver

At the outset, the State and Mother assert that Father has waived his constitutional due process arguments by failing to raise them before the trial court. Generally, Father asserts that issues of due process cannot be waived. We disagree. *See Bottorff v. Sears*, No. M2017-01363-COA-R3-CV, 2018 WL 3574745, at *5 (Tenn. Ct. App. July 25, 2018), *perm. app. denied* (Tenn. Dec. 6, 2018) (determining the appellant's due process issue to be waived and explaining that "[w]hen an issue is not raised in the trial court, it is waived on appeal." (citing *Waters v. Farr*, 291 S.W.3d 873, 918 (Tenn. 2009); *In re M.L.P.*, 281 S.W.3d 387, 394 (Tenn. 2009); *Dye v. Witco Corp.*, 216 S.W.3d 317, 321 (Tenn. 2007); *Cookeville Reg'l Med. Ctr. v. Humphrey*, 126 S.W.3d 897, 905-06 (Tenn. 2004))).

Father does not dispute that he did not directly raise a due process argument during the rehearing proceedings. Instead, noting that he did raise an objection during the rehearing to the trial court's consideration of financial evidence presented for the intervening time period between the July 2014 hearing before the magistrate and the August 2016 rehearing, Father posits that this objection was directly related to his due process arguments. We determine that to the extent that Father's due process issues involve notice and an opportunity to defend himself on the post-July 2014 evidence, he did not waive these arguments. Also, because Father's substantive due process argument regarding "two punishments" is intertwined with his jurisdictional argument, we will address it here.

However, Father filed no motion in the trial court to stay the proceedings on his contempt rehearing until his modification petition was resolved, and the record reveals no such objection to the scheduling of the rehearing. We therefore determine that Father did waive his due process argument concerning the timing of the contempt rehearing prior to the modification hearing. Moreover, regardless of the ultimate resolution of Father's petition to modify his child support obligation, the child support order in effect with which Father was required to comply at the time of the *de novo* hearing before the trial court judge was the December 2013 agreed order. *See State v. Fred Ramos*, No. M2007-01766-CCA-R3-CD, 2009 WL 890877, at *4 (Tenn. Crim. App. Apr. 2, 2009), *perm. app. denied* (Tenn. Aug. 31, 2009) ("[A] court order, even if erroneous or subject to reversal on appeal, must be followed until it is reversed." (citing *Konvalinka*, 249 S.W.3d at 357)); *see also PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, No. W2012-01611-COA-R3-CV, 2013 WL 3806345, at *6 (Tenn. Ct. App. July 18, 2013) ("[The appellant] was not at liberty to simply ignore the trial court's order based upon its opinion that the trial court was incorrect.").

## 2. Procedural Due Process

Father's remaining procedural due process argument is that the rehearing was fundamentally unfair because he did not receive notice prior to the rehearing that financial evidence related to the intervening two years and one month since the hearing before the magistrate would be considered. He thereby argues that he was not afforded an adequate opportunity to defend himself for his failure to fully pay his child support obligation during that intervening period. "Civil contempt only requires that the contemnor be notified of the allegation and be given the opportunity to respond." *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 602, 611 (Tenn. Ct. App. 2006), *perm. app. denied* (Tenn. Oct. 30, 2006). It is undisputed that Father had proper notice of the rehearing before the trial court judge, was represented by counsel during the rehearing, retained an expert witness who testified during the rehearing, and testified himself.

As the State notes, Father was the party who requested the rehearing. His argument rests not on a lack of notice of the contempt petition against him but essentially on a lack of notice of the nature of a *de novo* hearing in the juvenile court. Having determined in a previous section of this opinion that Tennessee law is well established as to the *de novo* nature of a hearing before a juvenile court judge of a matter previously heard by a magistrate, *see Kelly*, 43 S.W.3d at 515, we further determine that Father had proper notice of the type of hearing he was requesting. Additionally, as Father acknowledges, the trial court at the opening of the rehearing stated to the parties:

> This is a *de novo* hearing. You understand as a process of the *de novo* hearing [Father] could get a higher purge payment, could get no purge payment?

Father's counsel replied in the affirmative.

On appeal, Father insists that at trial, he initially understood the trial court's statement to mean that the hearing would be *de novo* on the evidence presented only through the July 2014 hearing before the magistrate. This premise is not congruent with the established meaning of a traditional *de novo* hearing. "The *de novo* hearing is not a review of the record presented to the magistrate, but is a full evidentiary hearing akin to a new trial, as in an appeal from a general sessions court to a circuit court." *In re Zamorah B.*, 2013 WL 614449, at *4 (citing *Kelly*, 43 S.W.3d at 515). Father's procedural due process rights were not violated by the trial court's consideration of all evidence presented regarding his compliance or noncompliance with the December 2013 order through the time of the August 2016 rehearing.

### 3. Double Jeopardy

Father also asserts that the trial court erred by placing him in "double jeopardy" when the court considered the financial evidence for the intervening period between the July 2014 hearing and August 2016 *de novo* rehearing, finding Father in civil contempt and ordering a purge payment more than two years after Father had made a purge payment upon the magistrate's order. The State and Mother respond by asserting that double jeopardy is a concept of criminal law that does not apply to a civil contempt action. We agree with the State and Mother on this issue.

In response to a double jeopardy issue raised in a case involving an order of protection, this Court recently held that because the action was "a civil proceeding, the concept of double jeopardy is inapplicable." *Gibson v. Bikas*, 556 S.W.3d 796, 807 (Tenn. Ct. App. 2018), *perm. app. denied* (Tenn. July 18, 2018). In *Gibson*, 556 S.W.3d

at 807, this Court quoted with approval the explanation provided in *Gillet v. Molthan*, No. M2016-01628-COA-R3-CV, 2017 WL 1535104, at *8 (Tenn. Ct. App. Apr. 27, 2017):

> The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution protects individuals from being "'subject for the same offense to be twice put in jeopardy of life or limb.'" *State v. Watkins*, 362 S.W.3d 530, 540 (Tenn. 2012) (quoting U.S. CONST. amend. V). Our Supreme Court has explained that the Double Jeopardy Clause has been interpreted to provide three separate protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *Id.* at 541. The protections that the Double Jeopardy Clause provides show that it applies only to defendants in criminal proceedings. Because the current proceeding is a civil proceeding, the concept of double jeopardy cannot come into play. *See State v. Reese*, No. E2002-02003-CCA-R3-CD, 2003 WL 22697352, at *3 (Tenn. Crim. App. Nov. 14, 2003) (noting that protective orders granted pursuant to Domestic Abuse Statute are civil, not criminal, in nature).

While "[c]riminal contempt cases are subject to the double jeopardy provisions in the federal and state constitutions," "[t]he safeguards afforded to one accused of criminal contempt are not available to one accused of civil contempt." *Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510 (Tenn. 2005); *see also Ahern v. Ahern*, 15 S.W.3d 73, 75 (Tenn. 2000) (holding that the "constitutional protections against double jeopardy prohibited the defendant's retrial for criminal contempt" and comparing to a finding of civil contempt when "the one in contempt has the 'keys to the jail' and can purge the contempt by complying with the court's order"). The trial court's September 2016 order finding Father in civil contempt and ordering incarceration until an $8,525.00 purge payment was made did not violate Father's substantive due process rights.

As an ancillary argument, Father posits that the trial court did not have subject matter jurisdiction to order a "second punishment" for the contempt found. We note that Father did not raise an issue regarding subject matter jurisdiction in his statement of the issues. However, because subject matter jurisdiction "involves a court's lawful authority to adjudicate a particular controversy," *see Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), this Court shall, pursuant to Tennessee Rule of Appellate Procedure 13(b), "consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review." In support of his jurisdictional argument, Father relies on this Court's opinion in *Loy v. Loy*, 32 Tenn. App. 470 (Tenn. Ct. App. 1949),

*perm. app. denied* (Tenn. July 9, 1949). *Loy* is highly factually distinguishable in that it involved a second impermissible arrest on a contempt charge already resolved by final judgment and did not involve a *de novo* rehearing of a magistrate's decision. *Id.* at 482-83. In this instance, because the rehearing was a *de novo* proceeding, as previously explained, the trial court had the authority to enter a judgment of civil contempt and direct a purge payment.

Father's jurisdictional argument is therefore without merit. Moreover, having reviewed Father's due process arguments as explained above, we conclude that Father is not entitled to relief based on any violation of his due process rights in this matter.

### D. Father's Ability to Pay

Father contends that the trial court erred by finding that he had the ability to pay his child support obligation and thereby erred by determining that Father had willfully violated the December 2013 child support order.[9] Father specifically argues that he demonstrated during the rehearing that he did not have the ability to pay his child support obligation at that time and thereby shifted the burden of proof to Mother and the State to show that Father did have the ability to pay. Father insists that Mother and the State presented no proof to show that he did have the ability to pay. For their part, Mother and the State contend that Father failed to carry his burden of proof to demonstrate by a preponderance of the evidence that he did not have the ability to pay his child support obligation. Upon careful review, we conclude that the evidence does not preponderate against the trial court's findings that Father had the ability to pay his child support obligation at the time it was due and the ability to comply with the civil contempt order at the time it was entered.

"A finding of willful conduct must precede a judgment for contempt." *Reeder v. Reeder*, 375 S.W.3d 268, 280 (Tenn. Ct. App. 2012), *perm. app. denied* (Tenn. June 20, 2012) (quoting *Haynes v. Haynes*, 904 S.W.2d 118, 120 (Tenn. Ct. App. 1995)); *see also Konvalinka*, 249 S.W.3d at 357-58. In the context of a civil contempt finding for violation of a child support order, this Court has explained that in addition to a finding of willful conduct:

> Additionally, to hold a party in contempt for failure to pay child
> support, the court must also determine that the obligor had the ability to pay

---

[9] Father phrases this issue as whether the "Magistrate and Special Judge" erred. We emphasize that because the hearing before the special judge was a *de novo* hearing and it is the order resulting from this hearing from which Father appeals, our review is not of the magistrate's findings but of the special judge's findings. *See In re Zamorah B.*, 2013 WL 614449, at *4 ("[I]n a *de novo* hearing, the juvenile court judge must decide the issues without regard to the actions of the Referee.").

24

at the time the support was due. *Ahern*, 15 S.W.3d at 79. Although the party to be held in civil contempt must have the ability to perform the act it is ordered to perform, *Leonard v. Leonard*, 341 S.W.2d 740, 743 (Tenn. 1971), the burden of proof is on the contemnor to show the inability to pay. *Pirrie v. Pirrie*, 831 S.W.2d 296, 298 (Tenn. Ct. App. 1992); *Leonard*, 341 S.W.2d at 743-44; *Gossett v. Gossett*, 241 S.W.2d 934, 936 (Tenn. Ct. App. 1951).

> The ability to pay means precisely what it seems to mean. The individual must have the income or financial resources to pay the obligation at the time it is due. Spending money on other bills or obligations does not absolve the failure to pay court-ordered child support. In fact, having the means to meet other financial obligations evidences an ability to pay child support.

*Buttrey v. Buttrey*, No. M2007-00772-COA-R3-CV, 2008 WL 45525, at *2 (Tenn. Ct. App. Jan. 2, 2008).

*Cisneros v. Cisneros*, No. M2013-00213-COA-R3-CV, 2015 WL 7720274, at *10 (Tenn. Ct. App. Nov. 25, 2015). Moreover, "[h]olding an individual in contempt is an available remedy 'only when the individual has the ability to comply with the order at the time of the contempt hearing.'" *Moore v. Moore*, No. M2004-00394-COA-R3-CV, 2007 WL 2456694, at *3 (Tenn. Ct. App. Aug. 29, 2007) (quoting *Ahern*, 15 S.W.3d at 79).

Father does not dispute the State's record of child support payments made or the amount of arrearage accumulated. Father asserts that he did not have the ability to pay the full amount of the child support obligation from early 2014 on despite having agreed to the $850.00 monthly payments required by the December 2013 order.[10] The child support worksheet attached to the December 2013 order listed Father's gross income as $4,850.00 per month. In support of his argument that he did not have the ability to pay the child support as ordered, Father relies in large part on Mr. Vance's testimony concerning his review of Father's and RS Financial's 2013 and 2014 federal income tax

---

[10] Although Father testified that he felt pressured into agreeing to the amount of child support set in the December 2013 order, he has not raised the validity of the December 2013 order as an issue. We note that Father was represented by counsel at the time and that the order was properly supported by a child support worksheet in accordance with Tennessee's Child Support Guidelines. *See Sykes v. Sykes*, No. M2012-01146-COA-R3-CV, 2013 WL 4714369, at *2 (Tenn. Ct. App. Aug. 28, 2013) ("In Tennessee, awards of child support are governed by the Child Support Guidelines ('the Guidelines') promulgated by the Tennessee Department of Human Services Child Support Services Division." (citing Tenn. Code Ann. § 36-5-101(e)(2))).

returns and bank statements. According to Mr. Vance's report and testimony, RS Financial reported $31,794.00 in total distributions to its members in 2014 and $60,497.00 in total distributions in 2015. It is undisputed that in 2013, Father was the sole member of RS Financial. In November 2013, Father and M.S. married, and subsequently, M.S. became a member of RS Financial in 2014 with a 49% ownership interest.

Mr. Vance calculated Father's income based on Father's 51% ownership in RS Financial, stating that Father was only entitled to that portion of the distributions. In his report, which centered on 2014, Mr. Vance thereby noted 2014 distributions to Father in the amount of $16,215.00 and to M.S. in the amount of $15,579.00. Applying the same calculation to 2015, RS Financial's 2015 distributions would be $30,853.47 (51%) to Father and $29,643.53 (49%) to M.S.

Regarding Father's income to be considered for the specific time period of January to June 2014 (the six-month period between entry of the December 2013 order and the July 2014 hearing before the magistrate), Mr. Vance opined in his report:

> The gross collections or gross income is $50,766, company expenses are $22,308 for commissioned sales persons other than Father and the other LLC member, and $10,254 for all other expenses, for a net taxable income or net profit of $18,204. LLC distributions paid to RS's 51% member, Father, are $6,254 and to the 49% member, $6,008, for a total of $12,262. If the LLC distributions had been deducted as company expenses, the Net Available for Working Capital is $5,942 during this six month period.

In this vein, Father maintains that his gross personal income for the entire first half of 2014 was only $6,254.00. Father provided the federal tax returns and bank statements that were the basis of Mr. Vance's report. Father's 2014 federal tax return was filed jointly with M.S. and included $43,905.00 in gross wages earned by M.S. in the outside employment position she held in 2013 but no longer held in 2014. The total amount of adjusted gross income reported on Father's and M.S.'s joint 2014 federal tax return was $81,196.00.

Although Mr. Vance's report and testimony would have Father earning very little income during the relevant time periods, the proof presented became less clear when testimony from Father, M.S., and Mr. Vance indicated that at some point in 2014, RS Financial began partially operating out of a separate bank account that had been opened solely in M.S.'s name and was not included in discovery or presented during trial. Mr. Vance testified that he believed he reviewed the "other account" and took it into consideration in his report despite acknowledging that he had no direct recollection of

doing so. Father testified that he was not a signatory on this other account, although it was a business account for RS Financial. M.S. testified that Father and she decided to have solely her name on the other account because "they tried to freeze our bank account to where we weren't going to be able to pay people," meaning independent brokers or contractors working with RS Financial.

Father urges this Court to consider the November 2017 modification order and, because the ultimate outcome of that order was a retroactive reduction in his child support owed, determine that he did not have the ability to pay his court-ordered obligation from January 2014 forward. Here, we must reiterate that the modification order was the result of a separate proceeding and that the purpose of the *de novo* contempt rehearing was to determine whether Father had willfully violated the child support order in place at the time of the rehearing. *See Ramos*, 2009 WL 890877, at *4 ("[A] court order, even if erroneous or subject to reversal on appeal, must be followed until it is reversed." (citing *Konvalinka*, 249 S.W.3d at 357)).

This said, we note that the modification in Father's child support obligation provided in the November 2017 order was based on factors other than Father's income, including a recalculation of Mother's income, changing health insurance plans for the Child, a credit for Father's child born in 2015, and other credits for Father and Mother that previously had not been factored into the child support calculations. Notably, the magistrate found in the November 2017 modification order that "Father is voluntarily and willfully underemployed because his choice to make [M.S.] a 49% shareholder in his business was motivated by an intent to avoid or reduce the payment of child support and was an 'intentional choice or act that adversely affects a parent's income,' especially in light of the statements by Father about the timing of all of these events."

Although in the contempt order from which Father appeals in this proceeding, the trial court judge did not make such a clear finding regarding Father's motivation in making M.S. a 49% shareholder in RS Financial, the trial court's findings do indicate that it did not find Father's description of his income credible and did not accept the expert's analysis of M.S.'s distributions as unavailable to Father. In the September 2016 order, the trial court found that Father "was and is able to comply with the Court's order of support and willfully refused to pay." At the close of the rehearing, the trial court stated in relevant part:

> Well, the burden of proof in this case is a preponderance of evidence. [Father] has clearly an order that requires [him] to pay $800.00 a month in child support plus $50.00 a month on an outstanding arrearage. He has the present ability to make those payments. [Father] has spent more

fighting the child support that has been owed since this hearing started up, so he's clearly had the ability to pay.

The Court finds that the decision to fail to make those payments is willful and intentional. The Court has calculated up the amount of support that was owed and has not been paid since the last contempt hearing. We will set the purge at that amount and [Father will] be held indefinitely to the Shelby County Jail until he pays the purge . . . .

Father takes issue with the trial court's oral statement that Father had "spent more fighting the child support that has been owed since this hearing started up . . . ." While we agree with Father that he certainly has a right to retain counsel and an expert witness to defend himself without having those actions count against him, in reviewing the record as a whole, we determine that the trial court simply did not find Father's evidence of his inability to pay support to be credible. Assuming, *arguendo*, that we were to consider the magistrate's modification order in full, as Father requests, such consideration would only confirm this assessment of the trial court's rationale for finding that Father had willfully violated the December 2013 order. *See Konvalinka*, 249 S.W.3d at 357 ("Determining whether the violation of a court order was willful is a factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and assess their credibility.").

On appeal, Father focuses the details of his argument on this issue primarily on his alleged inability to pay at the time of the rehearing as his rationale for why the trial court erred in utilizing civil contempt as a remedy. *See Moore*, 2007 WL 2456694, at *3. Father emphasizes testimony reflecting that at the time of the rehearing, he was "behind on the mortgage, car note, and was struggling financially"; he owed a federal tax debt; and had borrowed from his mother and wife to make payments on his vehicle and partial child support payments. In response, the State and Mother argue that Father's acknowledged expenses demonstrate that he has failed to prioritize his court-ordered child support obligation. As the State phrases it: "Father made clear that the bills related to RS Financial—e.g., commissions due to the commissioned salespersons—were paid before anything else."

Although this prioritization of his business is understandable as Father's effort to keep the business afloat, the evidence does not preponderate against a finding that Father had financial resources but consistently placed paying the full amount of his child support lower on the priority list than other obligations. Notably, testimony, along with Father's answers to interrogatories presented as an exhibit at trial, demonstrated that Father and M.S. purchased a new Chevrolet Tahoe for $46,000.00 in December 2015, incurring a monthly vehicle loan payment of approximately $800.00 at a time when Father insisted

28

he was incapable of making an $850.00 child support payment. Although Father testified that he and M.S. were two months behind on their vehicle payment at the time of the rehearing, Father indicated no plan to reduce or eliminate this expense. *See Cisneros*, 2015 WL 7720274, at *10 ("Spending money on other bills or obligations does not absolve the failure to pay court-ordered child support." (quoting *Buttrey*, 2008 WL 45525, at *2)).

We determine that the evidence does not preponderate against the trial court's conclusion that Father had the ability to pay his court-ordered child support during all relevant times prior to the August 2016 rehearing and therefore willfully violated the December 2013 agreed order. We further determine that the evidence does not preponderate against the trial court's finding that Father failed to carry his burden of proving that he did not have the ability to pay the contempt "purge" payment required by the September 2016 order. Therefore, the trial court did not abuse its discretion by finding Father in civil contempt of court and ordering the $8,525.00 purge payment.

## V. Attorney's Fees at Trial

Father further contends that the trial court erred by awarding to Mother attorney's fees and litigation costs in the amount of $29,648.80 in relation to the contempt rehearing. Specifically, Father argues that the trial court (1) violated Father's Fifth Amendment right against double jeopardy, (2) impermissibly based this award in part on the magistrate's July 2014 contempt finding, and (3) failed to find that Father had the ability to pay the amount ordered. Father has not otherwise questioned the reasonableness of the fee amount awarded. Upon careful review, we determine that the trial court did not abuse its discretion in entering the $29,648.80 award of attorney's fees and costs to Mother. We will address each of Father's arguments in turn.

The version of Tennessee Code Annotated § 36-5-103(c) (2017) in effect when this contempt action commenced provided as follows:[11]

---

[11] Effective July 1, 2018, the General Assembly has amended Tennessee Code Annotated § 36-5-103(c) to substitute the following language:

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

*See* 2018 Tenn. Pub. Acts, Ch. 905 § 1 (H.B. 2526).

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

As this Court has previously explained with reference to an award of attorney's fees:

> The Trial Court has wide discretion to award attorney's fees. Upon review, this Court will not interfere with an award, except upon a showing of abuse of discretion, where the evidence preponderates against the award, and a manifest injustice will be done if the Trial Court's decision is allowed to stand.

*Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001), *perm. app. denied* (Tenn. Feb. 19, 2002).

Concerning the reasonableness of a fee award, Tennessee Supreme Court Rule 8, Rule of Professional Conduct ("RPC") 1.5 states in pertinent part:

(a)    A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

        (1)    the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

        (2)    the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

        (3)    the fee customarily charged in the locality for similar legal services;

        (4)    the amount involved and the results obtained;

(5)     the time limitations imposed by the client or by the circumstances;

(6)     the nature and length of the professional relationship with the client;

(7)     the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8)     whether the fee is fixed or contingent;

(9)     prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10)    whether the fee agreement is in writing.

The trial court in its July 12, 2017 order awarding attorney's fees for the contempt rehearing proceedings stated in pertinent part:

The Title IV-D attorney, Virginia M. Alexander; [Mother's] attorneys, Rachael E. Putnam and Austin T. Rainey; [Father's] attorneys, Carol J. Chumney; and the Mother and the Father were before the Court and the Court having heard argument, statements of counsel, and the testimony of Rachael E. Putnam finds as follows:

1.     The Court has reviewed the Affidavit of Ms. Rachael E. Putnam, Esq., considered the testimony of Ms. Putnam, and reviewed the supporting itemized billing statements of counsel for Mother, including itemized fees, rates, expenses, etc.

2.     The Court finds the hourly rates of Ms. Putnam and Mr. Rainey, as well as the rates of other counsel associated in this matter, to be reasonable, taking into consideration the fee customarily charged by other attorneys that practice family law in the Memphis and Shelby County, Tennessee area.

3.     The Court finds that the fees and expenses incurred by Mother and requested by Ms. Putnam in the amount of $27,448.80 are more than reasonable given that

a.      This matter has taken over two years since August 2014.

b.      Mother was successful in the filing of her Petition for Contempt because Father was found to be in willful contempt on two occasions by the Court and made to make a purge payment for the amount of child support arrears.

c.      Mother was required to exhaust efforts to make Father produce information related to his income and ability to pay, including issuing subpoenas and defending Father's Motion to Quash.[12]

d.      Mother's attorney fee agreement was fixed and in writing.

e.      Mother has limited means to pay her attorney fees, and

f.      The Affidavit of Mother's counsel conforms to the requirements of RPC 1.5(a).

4.      The Court finds after hearing the proof and reviewing RPC 1.5 that Mother shall be entitled to a judgment against Father in the amount of $29,648.80 for attorney's fees and litigation expenses incurred by her, which represents the $27,448.80 incurred by Mother from August 2014 to January 2017, as well as $2,200 for the 5.5 hours Mother's counsel was required to attend the hearing on this matter.

(Some punctuation added.)

First, as explained in a previous section of this opinion, the concept of double jeopardy does not apply in this civil proceeding. *See Gibson*, 556 S.W.3d at 807. Father's double jeopardy argument is without merit.

Second, Father argues that the trial court's order demonstrates that the court impermissibly based the award of attorney's fees related to the rehearing in part on the initial July 2014 proceeding before the magistrate. We disagree. Father is correct that in conducting a *de novo* hearing, the trial court was not to consider the magistrate's previous decision on Mother's contempt petition. *See In re Zamorah B.*, 2013 WL 614449, at *4

---

[12] During the discovery process, Father had filed motions to quash various subpoenas of bank records requested by Mother. Generally, the trial court had denied the motions to quash as they applied to financial records of RS Financial but had granted the motions as they related to personal financial records for M.S.

32

("[I]n a *de novo* hearing, the juvenile court judge must decide the issues without regard to the actions of the Referee."). Father questions the trial court's statement in its order that "Mother was successful in the filing of her Petition for Contempt because Father was found to be in willful contempt <u>on two occasions</u> by the Court . . . ." (emphasis added). As one factor to be considered, the trial court was stating that Mother was the prevailing party in that she had successfully enforced the existing child support order. *See* Tenn. Code Ann. § 36-5-103(c).

We determine that inasmuch as Mother was the prevailing party in the *de novo* hearing, the fact that she was also the prevailing party in the hearing before the magistrate did not affect the award of attorney's fees for the *de novo* proceeding. The trial court expressly found the amount of attorney's fees awarded to be properly calculated for services rendered from "August 2014," the month following the hearing before the magistrate, through the instant hearing concerning attorney's fees. *See* Tenn. Code Ann. § 36-5-103(c); Tenn. Sup. Ct. R. 8, RPC 1.5(4). Father is also not entitled to relief on this argument.

Third, Father asserts that the trial court erred in failing to consider his ability to pay the award of attorney's fees at the time of the order's entry. Concerning proof of a party's ability to pay the other's attorney's fees in an award based on Tennessee Code Annotated § 36-5-103(c), this Court has stated:

> [A]lthough not controlling, in awarding attorney's fees pursuant to section 36-5-103(c), a trial court may consider proof of a [party's] inability to pay such fees and whether one party is at an economic disadvantage[] in comparison to the other. *See Taylor* [*v. Fezell*], 158 S.W.3d [352,] 360 [(Tenn. 2005)]; *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992) (holding that while inability to pay is a factor to be considered, trial courts may award attorney's fees without such proof as long as the award is just and equitable under the facts of the case); *Owens* [*v. Owens*], 241 S.W.3d [478,] 486 [(Tenn. Ct. App. Mar. 29, 2007)] (noting that in divorce cases trial courts customarily award attorney's fees as alimony when an economically disadvantaged spouse would otherwise be forced to deplete assets in order to pay for attorney's fees). We have stressed, however, that "the purpose of requiring a non-custodial parent to pay attorney fees is to protect the legal remedies of the child, not the parent." *Ingram v. Ingram*, No. 02A01-9501-CH-00005, 1996 WL 138443, at *8 (Tenn. Ct. App. March 27, 1996) (citing *Sherrod*, 849 S.W.2d at 785) (affirming the trial court's order that each parent pay their own attorney's fees because there was no indication that the child's welfare would be adversely [a]ffected otherwise). "Courts grant attorney's fees awards in child custody or

support proceedings to 'facilitate a child's access to the courts.'" *Eberbach v. Eberbach*, No. M2014-01811-COA-R3-CV, 2015 WL 6445480, at *6 (Tenn. Ct. App. Oct. 23, 2015) (quoting *Sherrod*, 849 S.W.2d at 784).

*In re Jasmine G.*, No. M2015-01125-COA-R3-JV, 2016 WL 1072847, at *5 (Tenn. Ct. App. Mar. 16, 2016).

As Father acknowledges, the trial court specifically found that "Mother ha[d] limited means to pay her attorney fees." The trial court also found that the attorney's fees requested were "more than reasonable" considering the factors delineated in RPC 1.5. Although the trial court did not make a finding in this order concerning Father's ability to pay, the court in its September 2016 order finding Father in civil contempt had found that Father had the ability to pay his court-ordered child support and had willfully failed to do so. Moreover, having found Father in civil contempt, indicating a finding that Father had the ability to pay his child support obligation, and having found an award of attorney's fees appropriate pursuant to Tennessee Code Annotated § 36-5-103(c), the trial court's additional consideration of Father's ability to pay those attorney's fees was at that point discretionary. *See In re Jasmine G.*, 2016 WL 1072847, at *5 (citing *Taylor*, 158 S.W.3d at 360).

We emphasize that "the purpose of requiring a non-custodial parent to pay attorney fees is to protect the legal remedies of the child, not the parent." *See In re Jasmine G.*, 2016 WL 1072847, at *5 (quoting *Ingram v. Ingram*, No. 02A01-9501-CH-00005, 1996 WL 138443, at *8 (Tenn. Ct. App. Mar. 27, 1996)). We conclude that the trial court did not abuse its discretion in awarding to Mother $29,648.80 in attorney's fees and litigation expenses related to the rehearing of her contempt petition.

IV. Attorney's Fees on Appeal

In the argument section in his amended principal brief concerning attorney's fees awarded at trial, Father requests that this Court award him attorney's fees on appeal. However, he did not include attorney's fees on appeal as one of his issues presented to this Court. "'Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4)' in order to be properly before this Court." *Gibson*, 556 S.W.3d at 810 (quoting *In re Estate of Burke*, No. M2012-01735-COA-R3-CV, 2013 WL 2258045, at *6 (Tenn. Ct. App. May 21, 2013)). In an abundance of caution, the State in its responsive brief has added Father's request for attorney's fees on appeal in its description of the issues before this Court. Neither Mother nor the State has raised an issue concerning attorney's fees incurred by Mother on appeal. We note that this Court's decision regarding whether to

award attorney's fees on appeal is a discretionary one. *Young v. Barrow*, 130 S.W.3d 59, 66-67 (Tenn. Ct. App. 2003), *perm. app. denied* (Tenn. Jan. 26, 2004).

We determine that Father has not properly raised an issue concerning his attorney's fees on appeal. *See, e.g.*, *Gibson*, 556 S.W.3d at 810. Moreover, we note that given Father's lack of success on appeal, he would not be entitled to such an award even if the issue had been properly raised. *See Stratienko v. Stratienko*, 529 S.W.3d 389, 412-13 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. Aug. 16, 2017) (noting that the factors to be considered in awarding attorney's fees on appeal include "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered" (quoting *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 WL 22071454, at *10 (Tenn. Ct. App. Sept. 3, 2003))).

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in its entirety. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the judgment and collection of costs assessed below. The costs on appeal are assessed against the appellant, Christopher Lee Sumner.

_____
THOMAS R. FRIERSON, II, JUDGE